**Jean F. POULIOT, Plaintiff,**

v.

**The TOWN OF FAIRFIELD, et al., Defendants.**

**No. 01–CV–179–B–S.**

United States District Court, D. Maine.

Feb. 19, 2002.

42

Warren M. Silver, Warren Silver, P.A., Bangor, ME, for Plaintiffs.

Mark V Franco, Lisa Fitzgibbon Bendetson, Esq., Thompson & Bowie, Portland, ME, for Defendants.

## ORDER

SINGAL, District Judge.

The former police chief of Fairfield, Maine, complains that town officials revealed confidential information about his health to the press and refused to hold a hearing before terminating his employment, in violation of his civil rights. Presently before the Court are Defendants' Motion to Dismiss Plaintiff's Complaint (Docket # 2) and Motion to Dismiss Plaintiff's Amended Complaint (Docket # 6). For the reasons outlined below, the Court DENIES the Motion to Dismiss Plaintiff's Complaint as MOOT, and GRANTS IN

PART and DENIES IN PART the Motion to Dismiss Plaintiff's Amended Complaint.

## I. STANDARD OF REVIEW

The Court may grant a motion to dismiss pursuant to Rule 12(b)(6) "only if it clearly appears that [the Plaintiff] cannot recover on any viable legal theory...." *Barrington Cove, LP v. Rhode Island Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 5 (1st Cir.2001). In assessing the viability of Plaintiff's claims, the Court must "accep[t] as true all well-pleaded factual averments and indulg[e] all reasonable inferences in the [P]laintiff's favor." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). However, the Court is not required to credit Plaintiff's bald assertions or unsupported legal conclusions. *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990). In accordance with these standards, the Court accepts the following version of events as true for the purposes of this Order.

## II. BACKGROUND

### A. Overview

Plaintiff Jean Pouliot is the former police chief of Defendant Town of Fairfield, Maine ("the Town"). His dispute with the Town grew out of the coincidence of two events in 1998 and early 1999: a deterioration in his physical and mental health and suspicious spending within the Police Department. Together, these events sparked a series of inquiries, discussions, hearings and reports that led to the termination of Pouliot's employment, and, ultimately, this lawsuit.

### B. Pouliot's Health

In 1994, Pouliot was diagnosed with Type II non-insulin-dependent diabetes. Starting in 1998 and throughout 1999, he began to experience increased personal and professional stress, depression and chronic fatigue. He also gained weight, which exacerbated his diabetes.

### C. Police Department Finances

At the same time that Pouliot's physical and mental health began to deteriorate, an anomaly in the Police Department's finances came to light. For fiscal year 1998–99, the Department exceeded its $450,000 budget by about $33,000. In late July 1999, Town Manager Terry York questioned Pouliot about the discrepancy. Pouliot, in turn, instructed Captain John Emery to investigate the Department's spending. Emery's review of receipts and invoices revealed several purchases on a Department credit card, issued in Pouliot's name, that did not appear to be legitimate Department expenditures. On August 5, 1999, without having discussed the suspicious purchases with Pouliot, Emery reported his findings to Town Manager York.

On August 18, 1999, York confronted Pouliot about the credit card purchases. Because she did not show him receipts or other documentation, however, he was unable to explain the purchases beyond speculating that he might have confused the credit card he used for police purchases with his identical personal credit card. He offered to reimburse the Town and ultimately paid approximately $115. During his meeting with York, he also revealed to her his physical and mental health difficulties and asked her to keep the information confidential.

### D. Pouliot's Interaction with the Town Council

On August 20 and 24, 1999, Pouliot spoke to the Chairperson of the Town Council ("the Council"), Defendant Dawnalysce Clifford, about his physical and mental health problems but asked her to keep

the information confidential. On August 24, the Council held a special meeting, during which Councilors discussed the Police Department's overspending and unidentified credit card purchases. Pouliot read aloud a statement apologizing for the overdraft on the budget and citing "underlying medical, health and personal issues." (*See* Am. Compl. at ¶ 30 (Docket # 4).) Later that evening, the Council also met in executive session, with Pouliot present, to discuss proposed disciplinary action against him. Following the session, the Council voted to suspend Plaintiff for two weeks without pay, require him to pay restitution for any as-yet-undiscovered personal purchases and require him to attend mental health counseling. The Council also voted to have an independent audit of Department accounts performed.

On August 31, 1999, as the Council had required, Pouliot began mental health counseling with a licensed clinical social worker. The following day, Pouliot again met with the Town Council in executive session. Clifford asked him to share with the rest of the Council what he had told her about his physical and mental health problems. Requesting that the Councilors keep the information confidential, he discussed how the health problems associated with his diabetes had affected his mental well-being. He also informed them that he had started the mandated counseling. York nevertheless informed him at this session that he would have to decide by September 3, 1999, whether he wished to resign as police chief.

On September 2, a physician diagnosed Pouliot with acute depression with sleep disturbance. The physician wrote a note, which Pouliot's wife delivered to the Town Office, stating that Pouliot was being treated for a serious condition and was unable to perform his job duties at that time. The same day, Pouliot's attorney wrote a letter to York explaining that Pouliot was under medical care for stress and other health problems and would not be capable of deciding about his resignation by September 3.

On September 7, 1999, York wrote to Pouliot informing him that another disciplinary hearing had been scheduled for September 9. One of the seven issues on the agenda for the hearing was the questionable credit card purchases. On September 8, 1999, Pouliot (through his attorney) responded that because of his medical problems, he would be unable to participate effectively in a disciplinary hearing on that date. He further indicated that he intended to request sick leave at the end of his two-week disciplinary suspension. Appended to this response was a copy of the physician's note indicating that his medical condition prevented him from working.

The disciplinary hearing was rescheduled to September 15, 1999. Again, Pouliot's attorney informed the Town that Pouliot's medical problems would not allow him to attend and defend himself on that date. His attorney requested that Pouliot be allowed to take advantage of his accrued sick leave until his physician determined that he was medically able to respond to the allegations. The Town refused to postpone the hearing, and, through its attorney, threatened to terminate Pouliot in his absence if he did not attend. The Town's attorney further indicated that although Pouliot would be entitled to certain benefits if he were to retire voluntarily, he would not receive those benefits if he were terminated.

On September 13, 1999, Pouliot's attorney told him that the Town had refused to postpone the disciplinary hearing a second time and would not negotiate. Believing that his only choices were to resign or be terminated, Pouliot opted to resign and

informed the Town that he was prepared to do so.

## E. The Independent Investigations and Pouliot's Separation from Employment

During late September, Pouliot and the Town negotiated the terms of his resignation. The Town agreed to accept his voluntary resignation and pay him for his accrued sick and vacation days. In return, Pouliot was required to reimburse the Town for any credit card transactions that he could not identify as legitimate. The Councilors showed Pouliot a draft report of the independent audit of the Police Department finances that the Council had commissioned. The report listed fifty-eight credit card transactions that the auditors could not identify positively as legitimate police purchases. The transactions totaled $1636.42. For forty-six of the transactions, the only information provided was the date of purchase, the place of purchase and the purchase amount. Although Pouliot did not have access to receipts or other documentation, he was able to identify all but about $500 worth of purchases as legitimate. Ultimately, he agreed to reimburse the Town $509.91.

On September 23, 1999, the Council voted to execute the agreement between Pouliot and the Town. It further voted to send the results of the independent audit to both the state attorney general's office and the county district attorney's office.

In response to the Town's referral, the state attorney general's office began an investigation into Pouliot's conduct. At some point, an investigator met with Pouliot and allowed him to review documentation, including receipts from the credit card transactions for which he had already reimbursed the Town. With this information, Pouliot was able to justify all but three of the purchases as legitimate police expenses.

On October 8, 1999, Pouliot met with a psychiatrist. The psychiatrist diagnosed him with Bipolar II disorder and concluded that the disorder "had caused impaired judgment and a loss of mental capacity in Pouliot during the period surrounding his resignation from employment as Fairfield's Chief of Police." (*See* Am. Compl. at ¶ 64 (Docket # 4).)

On December 21, 1999, the investigator from the attorney general's office reported his finding that only three charges, totaling $22.95, were personal in nature. He further concluded that there was "no credible evidence that would support a finding that Chief Pouliot engaged in criminal conduct with respect to the use of the particular credit card." (*See* Am. Compl. at ¶ 67 (Docket # 4).)

## F. The Press Reports

During the course of the Town's efforts to uncover the source of the police spending discrepancies, two newspapers in the region reported the events as they unfolded. In addition to reporting the inconsistencies with the budget and credit card expenditures, they also periodically quoted Town Councilors as saying that Pouliot's medical difficulties contributed to the Police Department's financial problems.

On August 27 and 28, 1999, the Kennebec Journal quoted Defendant Clifford as saying that Pouliot's medical problems contributed to the budget overspending and credit card misuse. On September 15, 1999, the Bangor Daily News reported that "Town officials have said that medication Pouliot had been taking to control his diabetes had clouded his judgment." Finally, on September 22 and 24, 1999, the Kennebec Journal reported statements by town officials, including Defendant Frank-

lin Bouchard, indicating that Pouliot was being treated for diabetes.

## G. These Proceedings

On January 21, 2000, Pouliot filed a Charge of Discrimination with the Maine Human Rights Commission and the Equal Employment Opportunity Commission (EEOC), claiming that the Town had discriminated against him on the basis of his disability. He received a right-to-sue notice on August 29, 2001.

On August 31, 2001, he filed a Complaint in this Court against the Town of Fairfield and Councilors Clifford and Bouchard, as well as Councilors Richard Spear, Bill Bois, and Sheri Laverdiere, alleging violations of his procedural due process rights (Counts I and II); his constitutional right to privacy (Count III); the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. (Counts IV and V); and the Maine Human Rights Act, 5 M.R.S.A. § 4551 et seq. (Counts VI and VII).

On September 25, 2001, Defendants moved to dismiss all seven counts (Docket # 2). On October 15, 2001, Plaintiff simultaneously responded to the Motion to Dismiss and amended his Complaint, adding claims against Defendants in their individual capacities. On October 24, 2001, Defendants replied and raised immunity defenses to the new claims. In the same pleading, they moved to have their original Motion to Dismiss applied instead to the Amended Complaint. This pleading was docketed as Defendants' Motion to Dismiss Amended Complaint (Docket # 6). On November 8, 2001, Plaintiff filed a response to Defendants' immunity arguments, and on November 19, Defendants filed an additional reply.

1. The Court uses the term "Agreement" only as a shorthand to describe this set of four documents. It does not intend any legal con-

## III. DISCUSSION

The Court treats Plaintiff's Amended Complaint as having superseded the Complaint. See 3 James Wm. Moore et al., Moore's Federal Practice § 15.17[3] (3d ed.2000). Therefore, Defendants' original Motion to Dismiss Plaintiff's Complaint (Docket # 2) is moot, and the Court denies it.

However, the Court also grants Defendants' request to have the arguments in their original Motion to Dismiss applied to the claims in the Amended Complaint. The Court will treat Defendants' pleading of October 24, 2001 (Docket # 6), as a new Motion to Dismiss the Amended Complaint and will evaluate the parties' arguments as they now apply to the Amended Complaint.

## A. The Separation Agreement

■ Appended to Defendants' Motion to Dismiss are four documents, all dated in September 1999. Defendants claim that these documents constitute the agreement, referred to in the Amended Complaint, by which Plaintiff agreed to resign from his position as police chief ("Agreement").[1] One of the documents appears to be signed by Plaintiff and purports to release Defendants from all further liability arising out of Plaintiff's employment by the Town ("Release"). Defendants claim that this Release precludes the instant action.

■ Ordinarily, a court considering a motion to dismiss pursuant to Rule 12(b)(6) may not consider documents outside the pleadings. Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993). However, an exception to the general rule permits a court to consider

clusion about the validity or significance of the documents or the intent of the parties at the time they were signed.

documents the authenticity of which are not disputed by the parties; ... official public records; ... documents central to plaintiffs' claim; or ... documents sufficiently referred to in the complaint. *Id.* Defendants argue that the Court may consider the Agreement because it is central to Plaintiff's claims and is sufficiently referred to in the Amended Complaint.

Plaintiff counters that the Agreement is central not to *his claims* but rather to his adversaries' defenses and that the Amended Complaint barely refers to the Agreement. *See Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 16–17 (1st Cir.1998) (affirming trial court's decision to consider a trust agreement that the complaint discussed "at considerable length" and upon which the plaintiff admitted her allegations depended). The First Circuit, however, considers a prior settlement agreement by which the plaintiff releases defendants from all future claims to be central to the plaintiff's subsequent complaint. *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30 (1st Cir. 2001).

■ Nevertheless, even if a document is "central to the plaintiff's claim," its authenticity must also be accepted by both parties in order for a court to consider it on a motion to dismiss. *See Beddall,* 137 F.3d at 17 ("When ... a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (*the authenticity of which is not challenged* ), ... the trial court can review [the document] in deciding a motion to dismiss

under Rule 12(b)(6).") (emphasis added); *see also Blackstone Realty LLC v. FDIC,* 244 F.3d 193, 195 n. 2 (1st Cir.2001); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988). Plaintiff disputes the validity of the Agreement. Given the opportunity for more factual development, he expects to be able to show that he was misled about the contents of the Release and, due to his mental health problems, did not have the mental capacity to enter into a contract at the time.[2]

Because Defendants supplied the documents and Plaintiff challenges their validity, the Court declines to incorporate the Agreement into the Amended Complaint for purposes of the Motion to Dismiss. The Agreement does not, at this stage of the pleadings, provide a basis for dismissing the action. The preclusive effect of the Agreement may, however, be a proper issue for summary judgment or, ultimately, trial.[3]

## B. Section 1983 Claims

### 1. Procedural Due Process

■ Plaintiff claims that both the Town and the individual Defendants denied his rights under the Fourteenth Amendment by scheduling his pretermination hearing at a time when they knew he would be unable to respond to their allegations. As a consequence, he was forced to resign in order to avoid being terminated. To prove a violation of his procedural due process rights, Plaintiff must demonstrate that (1) his employment with the Town was a constitutionally protected interest, and (2) De-

---

**2.** Further factual development may indicate that Plaintiff ratified the Agreement by accepting its benefits. *See, e.g., Hogan v. Eastern Enter./Boston Gas,* 165 F.Supp.2d 55, 63 (D.Mass.2001). The Amended Complaint alleges nothing about whether he received the benefits of the Agreement, however, and Defendants have not argued this point.

**3.** Additional factual development on Plaintiff's capacity to enter into an agreement in September 1999, the extent to which he was represented by counsel when he signed the Release and whether he received the benefits of the Agreement may prove conclusive on this issue.

48

fendants deprived him of that interest without providing adequate procedural protections. *Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 534 (1st Cir.1995).

■ Defendants claim initially that Plaintiff has not satisfied the first prong of a procedural due process claim in that he has not identified any constitutionally protected interest that gives rise to his procedural due process claim. To the contrary, the Amended Complaint alleges specifically that Plaintiff had a protected property interest in his employment with the Town. *See Krennerich v. Inhabitants of Bristol,* 943 F.Supp. 1345, 1352 (D.Me.1996) (recognizing that municipal employee may maintain constitutionally protected property interest in his employment).

■ Second, Defendants argue that they cannot be liable because none of them individually could have denied Plaintiff proper process. They have offered no legal support for this contention, and the Court notes that the First Circuit has permitted terminated public employees to press procedural due process claims against individual members of a policy-making body in their individual capacities. *See Cotnoir v. Univ. of Maine Sys.,* 35 F.3d 6 (1st Cir.1994).

■ Third, Defendants object to the damages that Plaintiff seeks for the violation of his procedural due process rights. They claim that punitive damages are not available against the Town pursuant to section 1983. However, this objection is entirely irrelevant in that Plaintiff has not *sought* punitive damages against the Town. They further complain that compensatory damages are not available against a municipality pursuant to section 1983. On this score, they are simply wrong. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("Local governing bodies ... can be sued directly

under § 1983 for monetary, declaratory, or injunctive relief ....").

■ Fourth, Defendants contend that Plaintiff has not stated a deprivation of his procedural due process rights because the Amended Complaint demonstrates that the Town did not deny him an opportunity to respond to their allegations but rather offered him two hearings, which he simply declined to attend. Plaintiff counters that he did not refuse to attend but merely asked for a postponement. The Defendants' refusal to postpone the September 15 hearing, he argues, deprived him of his due process rights.

■ A municipal employee with a protected property interest in his employment is entitled, at a minimum, to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The opportunity to respond must be meaningful: it must occur "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *see also Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 13 (1st Cir.1988) ("[T]o be fair in the due process sense, ... the person adversely affected [must be] afforded the opportunity to respond, explain, and defend."). Plaintiff has successfully alleged that the two hearings Defendants offered him were not meaningful opportunities to respond in that his health was too poor at the time to allow him to "respond, explain, and defend" against their accusations.

■ Plaintiff must also establish, however, that it was possible to provide him with a meaningful opportunity to respond and that it was Defendants' actions that rendered the hearing inadequate. Defen-

dants' misconduct, if any, lay in their refusal to reschedule the September 15 hearing or otherwise accommodate Plaintiff's inability to attend. Determining whether Defendants were required to provide this additional protection requires the Court to balance the government and private interests that were at stake. *See In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litigation,* 56 F.3d 295, 301 (1st Cir.1995) (using the *Mathews v. Eldridge* factors to assess whether a hearing was a meaningful opportunity to respond). Specifically, it must consider (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substituted procedural safeguards," and (3) "the Government's interest, including ... the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The termination of Plaintiff's employment deprived him of a substantial interest. Whether Defendants risked erroneously depriving Plaintiff of that interest depends on Plaintiff's ability, if given the chance, to explain the credit card purchases. Plaintiff alleges that if he had been given time to recover and the opportunity to review relevant documents, he could have demonstrated that only three of the suspicious credit card expenditures were in fact personal purchases. If that is so, a postponement would have been a valuable additional safeguard. Finally, although the Amended Complaint does not indicate how long a postponement Plaintiff sought, the Court could reasonably conclude from Plaintiff's allegations that the burden on Defendants of a brief additional postponement would have been minimal.

Plaintiff has thus stated a claim that Defendants failed to offer him a meaningful opportunity to respond to their allegations and that, by refusing to postpone the September 15 hearing, they violated his procedural due process rights. *See, e.g., Maldonado Agueda v. Montalvo,* 826 F.Supp. 47, 49 (D.P.R.1993) (holding that employee created genuine issue of material fact as to whether municipality violated his due process rights by refusing to postpone his termination hearing to accommodate his illness).

However, the procedural due process claim only survives against the Town. It fails against the individual Defendants because they are entitled to qualified immunity. Qualified immunity "shields public officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brown,* 68 F.3d at 530–31 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

The right at issue for purposes of qualified immunity analysis is not Plaintiff's general right to notice and an opportunity to respond, but rather his right to have the September 15 hearing rescheduled to accommodate his health problems. *Cf. Borucki v. Ryan,* 827 F.2d 836, 838 (1st Cir.1987) ("[I]t is not sufficient for a court to ascertain in a general sense that an alleged right existed. . . ."). Plaintiff has not provided any authority clearly establishing how the *Mathews v. Eldridge* factors are to be balanced when a municipal employee seeks to have his termination hearing postponed repeatedly. Nor has the Court, through its own research, discovered any conclusive authority on this point.

**50**

Therefore, although it is *plausible* that Plaintiff will be able to establish that Defendants violated his due process rights, it certainly was not clear at the time Defendants refused to postpone the hearing which way the *Mathews v. Eldridge* factors would balance. A reasonable official in their position might have believed that after postponing the hearing once, the Town could simply fix a time for the hearing and require Plaintiff either to attend or waive his right to do so. The Court finds that the extent of the Councilors' obligation to repeatedly reschedule the hearing is one of the "grey areas" of due process rights, *see Borucki,* 827 F.2d at 838, that reasonable officials are not charged with knowing. Thus, although Plaintiff has stated a procedural due process claim and may continue to pursue that claim against the Town, the individual Defendants are entitled to qualified immunity.

### 2. Right to Privacy

Plaintiff also claims that the individual Defendants violated his constitutional right to privacy by revealing confidential information about his medical difficulties to the local press. Defendants have moved to dismiss this claim on the basis that the First Circuit has not recognized a constitutional right to nondisclosure of this type of information.

▮▮▮▮ The Fourteenth Amendment protects two different categories of privacy interests: "[o]ne is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Although they have not decided

the issue directly, both the First Circuit and this District have assumed that the first category protects individuals against dissemination of their confidential medical information. *See Vega–Rodriguez v. Puerto Rico Telephone Co.,* 110 F.3d 174, 183 (1st Cir.1997) ("[T]he [range of] the right of confidentiality . . . has not extended beyond prohibiting profligate disclosure of medical, financial, and other intimately personal data.") (citing *Borucki,* 827 F.2d at 841–42); *Corbin v. Chitwood,* 145 F.Supp.2d 92, 97 (D.Me.2001) (quoting *Vega–Rodriguez,* 110 F.3d at 183); *see also Doe v. Town of Plymouth,* 825 F.Supp. 1102, 1107 (D.Mass.1993) (recognizing a "constitutional right to privacy which encompasses nondisclosure of [plaintiff's] HIV status"). Although the limits of the claim are uncertain, it is at least clear that the First Circuit has not foreclosed a constitutional claim based on the type of disclosure that Plaintiff has alleged. Defendants, as public officials, may enjoy a privilege for disclosing the information to the extent that it was a proper matter of public concern, but neither party has briefed this issue, and the Court will not address it at this stage. For purposes of a motion to dismiss, therefore, Plaintiff's allegation that Defendants communicated to the press medical information they had received in confidence is sufficient to state a claim for violation of Plaintiff's privacy rights protected by the Fourteenth Amendment.[4]

### B. Americans with Disabilities Act and Maine Human Rights Act

The remainder of Plaintiff's claims arise under the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), and its state-law counterpart, the Maine Human

---

**4.** The individual Defendants may also be entitled to qualified immunity on Plaintiff's privacy claim, but they have not argued the issue.

Rights Act, 5 M.R.S.A. § 4551 et seq. (MHRA). Plaintiff contends that he is disabled, and that the Town's refusal to postpone the disciplinary hearing constituted a failure to reasonably accommodate his disability, in violation of both statutes. He further claims that the disclosure of his medical information subjects the Town to liability under both statutes.

■ To the extent that the state statute contains provisions analogous to the federal statute, the Court will "constru[e] the MHRA in a manner consistent with the prevailing federal caselaw." *Caldwell v. Fed. Express Corp.*, 908 F.Supp. 29, 36 (D.Me.1995). Therefore, the Court is not required to "continuously distinguish between the two statutes." *Soileau v. Guilford of Maine, Inc.*, 928 F.Supp. 37, 45 (D.Me.1996). It will analyze the substance of Plaintiff's claims under ADA caselaw only; if Plaintiff succeeds in stating a claim under the ADA, he also states a claim under the disability discrimination provisions of the MHRA. *See id.*

1. Failure to Accommodate

The ADA creates a cause of action against an employer who discriminates "against a qualified individual with a disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). Plaintiff argues that the Town failed to reasonably accommodate his disability by refusing to postpone his disciplinary hearing a second time. Defendants counter that Plaintiff fails to state a claim because he cannot satisfy the prerequisites that entitle him to the protection of the ADA.

■ In order to state a claim for an employer's failure to accommodate his disability, an employee must first allege that (1) he is disabled and (2) he is a qualified individual with a disability. *See Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 29–30 (1st Cir.2000). To be "disabled" within the meaning of the ADA, Plaintiff must

(A) [have] a physical or mental impairment that substantially limits one or more of [his] major life activities;

(B) [have] a record of such an impairment; or

(C) [be] regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff has failed to adequately allege a disability under any of these three categories. Although he claims that he has suffered from health problems that include diabetes, depression, Bipolar II disorder, and Post Traumatic Stress Disorder, he has not specified which health problem he is claiming as his disability. Nor has he pointed to any major life activity that any of these conditions substantially limits. Furthermore, to the extent that Plaintiff claims that his limitations were temporary and that he could have returned to his position as police chief within a reasonable amount of time, he has also failed to properly allege a disability. *See Toyota Motor Mfg. v. Williams*, 534 U.S. 184, ——, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002) (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001)) ("The impairment's impact must … be permanent or long-term."). Therefore, Plaintiff has inadequately alleged that he is disabled within the meaning of the ADA, and his failure to accommodate claim must be dismissed. *See Oliveras–Sifre v. Puerto Rico Dep't*, 214 F.3d 23 (1st Cir.2000) (affirming district court's dismissal of ADA claim for failure to allege a disability).

■ Moreover, even were the Court to assume that one of the impairments he

claims rises to the level of a disability, Plaintiff has also failed to allege the second element of an ADA claim, that he is a qualified individual with a disability. To be "qualified" within the meaning of the ADA is to be able, "with or without reasonable accommodation, [to] perform the essential functions of the employment position that [the] individual holds or desires." 42 U.S.C. § 12111(8). Thus, Plaintiff was required to allege that he would have been able to perform the essential functions of the position of police chief if Defendants had reasonably accommodated his disability by postponing the hearing. In fact, the Amended Complaint suggests that at the time the alleged refusal to accommodate him occurred, he "was being treated for a serious condition, . . . treatment would last several months, and . . . Pouliot was unable to perform his job duties." (*See* Am. Compl. at ¶ 37 (Docket # 4).) If his health problems prevented Plaintiff from performing his job duties, then Plaintiff could not perform the essential functions of his position as police chief. Because he has not adequately alleged either that he was "disabled" or that he was "qualified," his failure to accommodate claim under the ADA fails. His parallel claim pursuant to the MHRA likewise falls short. *See Caldwell,* 908 F.Supp. at 36.

### 2. Publicizing Confidential Medical Information

Plaintiff also claims that Defendants' release of his medical information to the press gives rise to liability under both the ADA and the MHRA.[5] Defendants raise both procedural and substantive objections to these claims.

■ Defendants first argue that the claim is time-barred under both statutes. The ADA and the MHRA contain different limitations provisions, and the Court will consider each statute separately. Under the ADA, Plaintiff was required to file his charge with the Equal Employment Opportunity Commission (EEOC) within three hundred days after the claimed unlawful practice occurred. 42 U.S.C. § 12117(a) (invoking procedures in 42 U.S.C. § 2000e–5). According to the Amended Complaint, Pouliot first told Town officials of his medical and mental problems on August 18, 1999. Thus, the first disclosure that he complains of must have occurred sometime after that date. Plaintiff filed his charge with both the EEOC and the Maine Human Rights Commission on January 21, 2000. Because only one hundred fifty-six days elapsed between August 18, 1999, and January 21, 2000, Plaintiff's EEOC charge was timely filed as to any event that occurred on or after August 18, 1999.

■ Plaintiff was further required to file his ADA action in this Court within ninety days of receiving his right-to-sue letter from the EEOC. 42 U.S.C. § 2000e–5(f)(1). He received his letter on August 29, 2001, and filed the instant action on August 31, 2001. Thus, his publication of confidential medical information claim under the ADA is not time-barred.

■ The statute of limitations under the MHRA is slightly different. Plaintiffs are required to bring their actions in

---

5. Although the law is unsettled on this issue, *see EEOC v. Overnite Transp. Co.,* CIV.A. 7:01CV00076, 2001 WL 1521584, at *2–*3 (W.D.Va. Nov. 30, 2001), the prevailing wisdom is that a plaintiff does not have to be a qualified individual with a disability in order to state a claim for publication of confidential medical information under the ADA. *See Cossette v. Minnesota Power & Light,* 188 F.3d 964, 969 (8th Cir.1999); *Rohan v. Networks Presentation LLC,* 175 F.Supp.2d 806, 811 n. 6 (D.Md.2001); *Pollard v. City of Northwood,* 161 F.Supp.2d 782, 793 (N.D.Ohio 2001). The First Circuit has yet to address the topic.

court "not more than 2 years after the act of unlawful discrimination complained of." 5 M.R.S.A. § 4316(2)(C). Plaintiff originally filed his Complaint on August 31, 2001.[6] Therefore, the Amended Complaint properly states claims under the MHRA based on any conduct that postdates August 31, 1999.

Plaintiff alleges that newspaper articles containing information about his health problems appeared on August 27 and 28, 1999, as well as September 15, 22, and 24. Assuming that the newspaper articles dated September 15, 22, and 24, 1999, rely on disclosures that occurred after August 31, Plaintiff's MHRA claim based on those disclosures is not time-barred.

■■■ Additionally, Plaintiff argues that the disclosures that gave rise to the August 27 and 28, 1999, articles are also actionable under the MHRA, even though they predate the limitations period, because they form part of a continuing violation. "The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations." *Crowley v. L.L. Bean, Inc.*, 143 F.Supp.2d 38, 53 (D.Me. 2001). The First Circuit has recognized two types of continuing violations in employment discrimination actions: systemic violations and serial violations. *Megwinoff v. Banco Bilbao Vizcaya*, 233 F.3d 73, 74 (1st Cir.2000). Although Plaintiff has not specified which branch of the doctrine he intends to invoke, he has not alleged facts suggesting that Defendants engaged in a systemic violation,[7] and the Court assumes that he intends to argue that the series of

disclosures to the press constituted a serial violation.

■■■ Serial violations consist of " 'a number of discriminatory acts emanating from the same discriminatory animus, each of which constitutes a separate wrong actionable under Title VII.' " *Id.* at 74 (quoting *Provencher v. CVS Pharmacy*, 145 F.3d 5, 14 (1st Cir.1998)). To establish a serial violation, at least one of the discriminatory acts must occur within the limitations period. *Id.* at 74–75. The serial violations branch of the continuing violation doctrine is a natural fit with, for example, a claim for hostile work environment sexual harassment, in which a long series of discriminatory acts can combine to create an overall hostile environment. *O'Rourke v. City of Providence*, 235 F.3d 713, 727 (1st Cir.2001).

■■■ In contrast, Plaintiff's allegations are an awkward fit with the doctrine. Plaintiff has not alleged that any discriminatory animus motivated Defendants' decision to reveal confidential medical information to the press. Moreover, Plaintiff may not take advantage of the continuing violation doctrine if the acts that preceded the limitations period were of the type to put him on notice of his claim. *See Perkins v. Champion Int'l Corp.*, Civ. No. 95–0249–B, 1997 WL 97106, at *5 (D.Me. 1997). Here, Plaintiff should have been aware that Defendants had revealed confidential medical information to the press as soon as the Kennebec Journal reported on August 27, 1999, that Defendant Clifford "said a medical condition and complications in the police chief's medicine for that

---

6. Because the Amended Complaint does not introduce any new claims, and because the Complaint was sufficient to put the individual Defendants on notice of the claims against them, the Amended Complaint relates back to the date of filing of the original Complaint for limitations purposes. Fed.R.Civ.P. 15(c).

7. Systemic violations refer "to general practices or policies, such as hiring, promotion, training and compensation." *Megwinoff*, 233 F.3d at 75.

**54**

condition contributed to the mismanagement of department funds." (*See* Am. Compl. at ¶ 32 (Docket # 4).) Subsequent disclosures were not necessary to alert him to the existence of a claim. Thus, the facts Plaintiff has alleged do not establish a serial violation of his rights under the MHRA, and he may not recover under that statute for the disclosures that led to the press reports of August 27 and 28, 1999.

▮ In addition to arguing that Plaintiff's claims are barred by the statute of limitations, Defendants also challenge them on the merits, arguing that the ADA does not provide a cause of action for publication of confidential medical information. To the contrary, the statute prohibits employers from disseminating medical information about their employees under certain circumstances. *See generally* 42 U.S.C. § 12112(d). Specifically, it provides that information obtained from current employees in conjunction with a voluntary medical examination or inquiry "into the ability of an employee to perform job-related functions" must be treated as a "confidential medical record" and may only be disclosed to certain specified individuals. 42 U.S.C. § 12112(d)(3), (4); *see Downs v. Massachusetts Bay Transp. Auth.,* 13 F.Supp.2d 130 (D.Mass.1998) (recognizing an ADA claim against an employer who gave a worker's compensation claims investigator access to plaintiff's medical file).

Plaintiff alleges that he revealed information about his mental and physical health to Town officials as part of their investigation into his management of Police finances. He further alleges that they took this information and revealed it to members of the press. Construing these allegations in Plaintiff's favor, the Court finds that Plaintiff may be able to demonstrate that he disclosed medical informa-

tion in response to the Town's inquiry into his ability "to perform job-related functions" and that the Town failed to keep that information confidential. *See Pollard v. City of Northwood,* 161 F.Supp.2d 782, 793 (N.D.Ohio 2001) (recognizing an ADA claim by a police officer for a city administrator's revealing the officer's mental health problems to the press). Although Defendants may also be entitled to a privilege for these disclosures, neither party has addressed this issue. Plaintiff has thus stated a claim for disclosure of confidential medical information under both the ADA and the MHRA.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss Plaintiff's Complaint as MOOT. It GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss Plaintiff's Amended Complaint. The Court DISMISSES Count I of the Amended Complaint WITH PREJUDICE. It DISMISSES Counts V and VII WITHOUT PREJUDICE. It DENIES the Motion to Dismiss with respect to Counts II, III, IV, and VI.

The Court further notes that the deadlines for discovery and dispositive motions have been extended by a revised scheduling order dated February 15, 2002. That order shall govern further proceedings in this matter.

SO ORDERED.