Jean Francois **POULIOT**, Plaintiff,

v.

The **TOWN OF FAIRFIELD,**
et al., **Defendants.**

No. CIV.01–179–B–K.

United States District Court,
D. Maine.

Sept. 4, 2002.

Warren M. Silver, Warren Silver, P.A., Bangor, ME, for Jean Francois Pouliot, plaintiff.

Mark V Franco, Lisa Fitzgibbon Bendetson, Esq., Thompson & Bowie, Portland, ME, for defendants.

## MEMORANDUM OF DECISION [1] ON MOTION FOR SUMMARY JUDGMENT

KRAVCHUK, United States Magistrate Judge.

Jean Francois Pouliot is pursuing a suit against the Town of Fairfield and Dawnalysce Clifford and Richard Spear in their individual capacities [2] in a seven-count second amended complaint seeking federal and state law remedies stemming from Pouliot's termination of employment as the Chief of the Fairfield, Maine Police Department.[3] (Docket No. 20.) Before me now is the defendants' motion for summary judgment in which they argue their entitlement to a summary disposition from several different vantage points.[4] (Dockets Nos. 24 & 25.) Pouliot has responded (Docket Nos. 26, 27, 28 & 29) and defendants have replied. (Docket Nos. 30 & 31.) I now **GRANT** the motion for summary judgment for the reasons that follow.

### Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A material fact is one which has the 'potential to affect the outcome of the suit under applicable law.'" *FDIC v. Anchor Properties,* 13 F.3d 27, 30 (1st Cir.1994) (quoting *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993)). The Court views the record on summary judgment in the light most favorable to the nonmovant. *Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993).

However, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

2. Richard Spear, Bill Bois, and Sheri La Verdiere were initially listed as defendants but the parties filed a stipulation of dismissal on May 20, 2002, with respect to these three individuals. (Docket No. 21.)

3. Judge Singal granted in part and denied in part a motion to dismiss by the defendants. *See Pouliot v. Town of Fairfield,* 184 F.Supp.2d 38 (D.Me.2002). Pouliot moved to amend his amended complaint thereafter and I granted the contested motion for a second amendment by order dated May 14, 2002. (Docket No. 19.)

4. One such argument is that the release Pouliot signed at the time of his resignation bars this litigation because he waived his right to sue the Town. Pouliot contests the validity of the release, however, as Pouliot's claims fail on other grounds, I will not discuss in depth the contested issues surrounding the validity of the waiver.

S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has presented evidence of the absence of a genuine issue, the nonmoving party must respond by "placing at least one material fact in dispute." *Anchor Properties*, 13 F.3d at 30 (citing *Darr v. Muratore*, 8 F.3d 854, 859 (1st Cir. 1993)).

## Facts

The following facts are taken from the statements of material fact submitted by the parties, as presented in the light most favorable to Pouliot on disputed issues of material fact. Defendants do dispute some of these facts, but for the purpose of this motion I accept the facts as put forth by Pouliot. Jean Pouliot began working for the Fairfield Police Department on March 25, 1974 and became the Chief of Police on October 1, 1989. Beginning in January, 1999, it was observed that the police department budget was approximately 9% over budget. The department continued to function without major incident and Pouliot was routinely and without discussion reappointed to his position as police chief in May, 1999. The total budget overrun as of the end of the fiscal year (June 30, 1999) was $32,000.00.

By memo dated July 27, 1999, Chief Pouliot appointed Captain John Emery as the financial officer and purchasing agent for the police department. On August 3, 1999, Pouliot met with Terry York, the Town Manager, to discuss the overdraft in the police budget. The next day, on August 4, 1999, Emery found what he considered to be personal charges made by Pouliot and charged to the Town on the credit card that was used for official police business. On August 9, 1999, a member of the press approached Pouliot to discuss his personal use of a "town credit card." The press had learned of the situation by way of a "leak" that originated with Captain Emery. On August 18, 1999, Pouliot met with York, admitted he had made a mis-

take, and reimbursed the Town $115.00 for personal purchases on the Town credit card. After the meeting, he returned to York's office and disclosed to her that he was experiencing a list of problems, including diabetes. Thereafter, he went to Dawnalysce Clifford, Chairperson of the Town Council, and revealed to her that he had diabetes, stress, mood swings, and a lack of sleep. On August 20, 1999, area newspapers carried articles detailing the police department budget overrun and the personal purchases made by the Chief with the Town's credit card. Eventually Pouliot attended a public Special Council Meeting on August 24, 1999, for the purposes of explaining the overage in his budget, the use of the credit card, an issue related to his use of a home office, and an issue concerning the use of police cruisers off duty. Prior to the meeting, Pouliot met and talked with York and Clifford about his diabetes and depression. At the August 24 Special Council meeting, Pouliot read a statement in which he took full responsibility for the budget and its overdraft and attributed some of the problems and issues to "underlying medical, health and personal issues which were being currently addressed." (Defs.' Statement of Material Facts ("DSMF") ¶ 42.) The Town Council, on recommendation from the Town Manager, voted to impose a disciplinary sanction on Pouliot consisting of (1) two weeks of suspension without pay; (2) loss of Pouliot's 3% raise; (3) attendance at workshops on budget preparations; (4) attendance at counseling at the Town's expense; and (5) restitution for any as of yet undiscovered purchases on the Town's credit cards. Pouliot accepted the Town Council's vote to impose these disciplinary sanctions.

After the Town Council's vote on August 24, the media reported petition drives circulating in the community seeking the ouster of both the Chief and the Town

Manager. Clifford, one of the defendants, was quoted in one article as stating that Pouliot's conduct was caused in part by a medical condition and complications with medications. Although Pouliot had told Clifford of his diabetes, she did not mention it in any conversation with the media or anyone else. On September 1, 1999, Pouliot met with the Town Council in executive session. At this meeting, Clifford told Pouliot to share with the Council what he told her about his medical condition. Pouliot then informed the entire Town Council of his diabetes and also explained to them that he was experiencing depression and that he felt his medical problems were one reason for his budgeting and spending problems. He requested that the information be kept confidential. At least one Town Councilor, Bill Bois, was aware of Pouliot's diabetes before the meeting and in fact Pouliot told him of the condition well before Bois was ever elected to the Town Council. During this executive session, Pouliot discussed the possibility of his voluntary resignation. York responded that she would accept his resignation and gave him until noon on Friday, September 3 to think about it.

On September 2, 1999, Pouliot saw a physician and obtained from the physician a "To Whom It May Concern" note. The note stated: "This letter is in regard to Jean Pouliot who is currently treated for a serious medical condition. He will continue to receive medical treatment over the next several months. At this time, Mr. Pouliot is unable to perform his job duties." On the same day Pouliot saw a lawyer. Pouliot's attorney wrote to the Town Manager and told her that Pouliot needed additional time to respond to her "ultimatum" that came from the September 1 meeting that would have required him to submit his resignation by "Friday noon." The defendants dispute that any such ultimatum issued from the September 1 meeting.

At some point after the September 1 executive session, Council member Bouchard disclosed to the press that Pouliot has diabetes. Two newspapers subsequently reported that Pouliot was being treated for diabetes. Prior to the executive session, Bouchard was not aware that Pouliot was diabetic.

By September 7, 1999, no further formal action had been taken in regard to Pouliot's status and the Town Manager had not yet decided what additional action she would take. On that date the Town's attorney wrote to Pouliot's attorney to advise him of the scheduling of a disciplinary hearing on Thursday, September 9, 1999. The disciplinary hearing's agenda was not limited to the discussion of the issue of Pouliot's purchase of personal items, but also included five other issues. Pouliot was sent a letter outlining those issues. His attorney responded to the notification on September 8, 1999, stating that Pouliot was in no medical condition to deal with this hearing at this time and that following the two-week suspension without pay imposed at the August 24 meeting Pouliot intended to take his accumulated sick leave. Pouliot's attorney asked whether the Town was willing to "put [the] hearing off for some time to enable [Pouliot] to follow through with the recommended counseling." (Ex. 31.) The attorney's letter was accompanied by the "To Whom It May Concern" physician's note, dated September 2, 1999.

At some point, the Town rescheduled the disciplinary hearing to September 15, 1999. Either before or soon after the hearing was rescheduled for September 15, Pouliot's attorney met with the Town's counsel, informed him that Pouliot was not in any condition to attend a disciplinary hearing, and again requested that the hearing be put off. Specifically, he requested that the disciplinary hearing not

be scheduled until Pouliot's two-week suspension and his sick time expired. This request was denied. At some point, Pouliot's attorney was led to believe that if Pouliot did not attend the September 15 hearing and fight the charges, he would be terminated.

It was not until September 13 or 14 that Pouliot's attorney realized that Pouliot was not going to be able to attend the hearing because he was "a basket case," breaking down and crying. (Pl.'s Resp. to Statement of Material Facts, Docket No. 28 ("PRSMF") ¶ 90; Pl.'s Resp. Additional Statement of Material Facts, Docket No. 29 ("PRASMF") ¶ 71.) They both were fully aware that the disciplinary hearing would not be held in the context of an open public hearing but that it would be conducted in a closed session consisting of Pouliot, his attorney, the Town's attorney, the Town Manager, and a few witnesses. The Town Manager had the exclusive authority to impose discipline on the Chief of Police. However, neither Pouliot nor his attorney asked that the September 15 hearing be postponed yet again, as they both believed that Pouliot had no option other than voluntarily resigning from his position as Chief. He did so, signing a settlement agreement purporting to release all claims against the Town.

After the events giving rise to this lawsuit had occurred, Pouliot was diagnosed with bipolar II disorder on October 14, 1999. This fact relates most significantly to the disputed issues of fact surrounding the voluntariness of the release signed by Pouliot at the time of his resignation.

### Discussion

#### A. Section 1983 Due Process Claim

■ Count II alleges the Town violated 42 U.S.C. § 1983 by its failure to provide Pouliot with due process when it refused to postpone the disciplinary hearing until he was medically and mentally able to attend, thereby denying him the meaningful opportunity to answer to the charges against him.[5] Pouliot alleges that the Town, in effect, forced him to choose between resigning with the benefits he was entitled to or being terminated without benefits due to his inability to defend himself in his condition. (Second Am. Compl. ¶ 87). To establish a deprivation of due process, Pouliot must show that (1) his employment was a constitutionally protected interest, and (2) that his employer deprived him of that interest without providing adequate procedural protections. *See Brown v. Hot, Sexy & Safer Prod., Inc.*, 68 F.3d 525, 534 (1st Cir.1995). "[O]rdinarily, one who can be removed only for 'cause' has a constitutionally protected 'property interest.'" *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 101–02 (1st Cir. 2002) (citing *Perkins v. Bd. of Dir. of Sch. Admin. Dist. No. 13*, 686 F.2d 49, 51 (1st Cir.1982)). Undoubtedly, Pouliot has met the first requirement as the Chief of Police can only be terminated by the Town Manager only with cause. *See* 30–A M.R.S.A. §§ 2671.

■ Having determined that Pouliot had a property interest in his position, I must now determine if he has shown that he was denied the process due to him. "[T]he basic requirements of due process are notice of the charges brought against the job-holder and an opportunity to respond to them." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 23 (1st Cir.1999). There is no dispute that Pouliot was provided with notice and an explanation of the charges against him; instead, the disputed issue is whether he was provided with the

---

**5.** Pouliot's Count I claim, alleging the same violations as Count II but against the individual defendants, was dismissed in *Pouliot v.* *Town of Fairfield*, 184 F.Supp.2d 38 (D.Me. 2002).

opportunity to respond. (*See* DSMF ¶¶ 77, 87.) The unique aspect of this case is that Pouliot was not actually terminated. He claims he was deprived of a pre-termination hearing as a result being constructively discharged. Essentially, he argues that the Town's refusal to reschedule the September 15, 1999 hearing until he was better suited to attend amounted to a constructive discharge as he was forced to resign and receive his benefits rather than be terminated without benefits as a result of his failure to adequately defend himself at the hearing. Pouliot's claim rests on his assertion that the opportunity to respond was not "meaningful" because he was not in a condition to attend the hearing.

 The opportunity to respond must occur "at a meaningful time and in a meaningful manner." *See Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). The only action the Town is alleged to have taken was its refusal, based on the information it then had before it, to delay the September 15, 1999, hearing. The determination of whether the Town was required to provide the additional protection of a further continuance requires the balancing of the three factors of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[6] *Id.* at 549, 85 S.Ct. 1187. The factors are: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substituted procedural safeguards," and (3) "the Government's interest, including... the fiscal and administrative burdens that the additional or substitute procedural requirement would

entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

Pouliot had a significant private interest in his position as Chief of Police. Courts frequently recognize the severity of depriving a person of his livelihood. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). On the other side of the balance, the Town has a significant interest in immediately resolving claims against employees in a position of trust and high public visibility, such as the Chief of Police, especially when the accusations involve misuse of Town funds and property. The Town asserts that it could not have postponed the September 15 hearing again without incurring serious problems and clearly could not have postponed the hearing indefinitely. (DSMF ¶ 216.) There is no dispute that on August 28, 1999 an area newspaper reported that petition drives were underway for the ouster of Chief Pouliot and the Town Manager for what critics were saying were their roles in mismanaging Town finances. (DSMF ¶ 48.) The Town Manager personally observed that the public confidence in the police department and the Town was in doubt in August and September of 1999. (DSMF ¶ 218.) The press was frequently interviewing the Town Manager about the Town's investigation of Pouliot's use of public funds for personal expenditures and about the citizens' drive to oust Pouliot. (DSMF ¶ 219.) At the September 8 Council meeting there was an outcry for the resignation of the Council. (PRSMF ¶ 219.) The Town asserts that delaying the hearing a second time or leaving Pouliot's job status unresolved would have substantially disrupted the operation of the

---

6. The right to a hearing does not depend on a demonstration of certain success, therefore it is of no consequence that the record is wrought with facts in dispute regarding personal charges on the Town credit card. *See*

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)).

police department and interfered with the operation of the town government. (DSMF ¶¶ 220, 222.) There is no dispute that the Town Manager could not accommodate any request that would adversely affect the operation of the police department as a whole, as the police department is responsible for public safety. (DSMF ¶ 221.) Based on these facts, there is no question that the Town had a significant interest in quickly resolving misuse of the Town credit card and restoring public confidence in the police department.

As to the third consideration, the risk of erroneous deprivation and the likely value of any additional procedures, Pouliot does not challenge the Town's policy on or procedures involved in the removal of officers. Rather, Pouliot challenges the Town's refusal to extend the hearing until Pouliot was in better medical and mental health. The Town argues that Pouliot sought to postpone the hearing indefinitely. The facts established in the record show that Pouliot's request for a delayed hearing meant that the hearing would be postponed until his two-week suspension and his 166 days of sick time expired. Thus, although Pouliot was not seeking an "indefinite" postponement, he wanted the Town to "put off" the hearing for at least five and a half months. At the time the Town denied this request, Pouliot had not been diagnosed with anything more then diabetes. Although the Town was also aware that Pouliot at times complained he was depressed, the Town received no specific medical information that he was unable to attend the September 15 hearing. The Town, as well as Pouliot, was not aware that he was suffering from bipolar disorder. Furthermore, there is nothing in the record indicating that on September 13 or 14 Pouliot's attorney informed the Town that Pouliot was mentally unable to handle attending the hearing. In light of the public's declining perception of the police department, the Town could not have

left the matter unresolved for five and one half months. The Town had already agreed to one extension, albeit a short one, on September 8. As early as August 28, 1999, the public was in an uproar, seeking to oust not only the Chief of Police but also the Town Manager. (DSMF ¶ 48.) The last thing the Town could do was allow the matter to linger. Thus, Pouliot's requested delay of five and one half months would have imposed a significant administrative burden and an intolerable delay on the Town.

There is a dispute regarding whether the Town requested Pouliot to submit more than the physician's note stating he could not work. However, there is no dispute that Pouliot never received a medical note or report stating that he was mentally incapable of attending a disciplinary hearing. The Town claims that the September 2 physician's note was inadequate to justify postponing the hearing a second time. Pouliot asserts that the Town never asked for evidence demonstrating that he could not attend the September 15 hearing due to his illness. Nonetheless, there is nothing in the record suggesting that the Town prevented him from presenting any such information. Pouliot's attorney concluded that he could not defend Pouliot without Pouliot attending the hearing and explaining what had happened. (PRSMF ¶ 100.) However, Pouliot does not allege that the Town did anything to prevent Pouliot from responding to the allegations through his attorney. To the contrary, in his deposition Pouliot's attorney stated that either the Town's counsel or the Council indicated that he could attend the hearing on Pouliot's behalf if he chose to do so. (See Jabar Dep. at 16.) Rather than proceed in that fashion or attempt to obtain a second continuance with additional medical documentation, Pouliot, after consulting with his counsel, chose to "voluntarily" resign. Pouliot may now regret his decision and

believe that he made the decision while suffering from a major mental illness, but at the time the decision was made, it was not caused by any constitutional defect in the process afforded to him by the Town.

Based on the facts in this case, I do not believe that Pouliot was deprived of due process as a matter of law when the Town, armed with the little information Pouliot provided, refused to wait five and one half months to schedule a disciplinary hearing and accepted his "voluntary" resignation.

## B. Failure to Accommodate Claims under the ADA and the MHRA

In Counts V and VII, Pouliot claims that the Town failed to accommodate him when it refused to postpone the hearing and to allow him to take a medical leave thereby violating the ADA and the MHRA. (Second Am. Compl. ¶ 107.) The ADA prohibits employers from discriminating against a qualified individual with a disability. *See* 42 U.S.C. § 12112(a). Failing to make a reasonable accommodation for a qualified individual falls under the definition of discrimination. *Id.* at § 12112(b)(5)(A). To prove a prima facie case of discrimination under the ADA, a plaintiff has the burden of showing three elements: "(1) he suffers from a disability as defined by the ADA; (2) he is otherwise qualified, that is, with or without reasonable accommodations, he is able to perform the essential functions of the job; and (3) his employer discriminated against him because of his disability." *See Soileau v. Guilford of Maine, Inc.*, 928 F.Supp. 37, 46 (D.Me.1996), *aff'd*, 105 F.3d 12 (1st Cir.1997); *Lessard v. Osram Sylvania, Inc.*, 175 F.3d 193, 197 (1st Cir.1999).

In order to meet the first element, that he had a "disability" within the meaning of the ADA, a plaintiff has the burden of showing that he

(A) has a physical or mental impairment that substantially limits one or more of his major life activities;

(B) has a record of such an impairment; or

(C) is regarded as having such an impairment.

*See* 42 U.S.C. § 12102(2).

Pouliot's claims are addressed under prong (A), as he does not allege that he had a record of an impairment or was regarded as having an impairment that substantially limited a major life activity. Thus, to show that he had a "disability" as defined by the ADA, Pouliot must establish that he had an impairment that substantially limits one or more of his major life activities.

■ The determination of whether an impairment substantially limits one or more of an individual's major life activities is guided by a three-step analysis considering: (1) whether the problem constitutes a physical impairment; (2) whether the life activities upon which plaintiff relies constitute major life activities under the ADA; and (3) whether the impairment substantially limited one or more of the major life activities. *Santiago Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 30 (1st Cir. 2000) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)). Reading the record most favorably to Pouliot, I find he satisfies the first two steps of this analysis. His diabetes and bipolar disorder are "impairments." *See* 29 C.F.R. § 1630.2(h)(1)-(2).[7] Here,

---

**7.** As the Town, in its memoranda, relies on case law that applies the EEOC guidelines and Pouliot does not raise an objection to the use of the guidelines, I apply the guidelines and do so without consideration to the validity of the guidelines and what, if any, defer-

ence they are due. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478–481, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (discussing, without determining, the EEOC's authority to issue regulations implementing the ADA); *Toyota Motor Mfg., Kentucky, Inc. v. Williams,*

"sleeping" is the claimed major life activity that is substantially limited.[8] Sleeping has been recognized as a major life activity. *See Criado v. IBM Corp.*, 145 F.3d 437, 442–43 (1st Cir.1998) (stating that sleeping is a major life activity).

The third step requires a showing that the impairment "substantially limited" the performance of the claimed major life activity. The Town asserts that Pouliot cannot show that he had a disability that substantially limited the major life activity of sleeping. In response, Pouliot states that the facts show that he was a qualified individual with a disability because his claimed impairments, diabetes and bipolar disorder, for many years substantially limited his ability to sleep.

■ Pouliot has provided the following evidence regarding his limitation on "sleeping." Beginning in 1984, he experienced difficulty sleeping, apparently lasting at least six months. Two years later, in 1996, he experienced insomnia for months at a time that was "worse" than his 1984 episode, as he obtained only four to five hours of sleep a night. Legal issues against the Town triggered the 1996 bout of insomnia. He took a five-week leave of absence. He states that he was unable to sleep in bed and instead watched television in a recliner until two or three o'clock in the morning before he could fall asleep. Around November of 1998, he again began experiencing increased problems with sleep. In the summer of 1999, he had several conversations with York concerning his health and how it was affecting his mental condition and specifically mention-

ing he had sleep problems, was not getting any rest, felt fatigued, and tended to doze off at afternoon meetings. Around June 1999, he informed York that he thought he was suffering from sleep apnea and that he was not getting any rest. On August 18, 1999, he told York that something was wrong with him, but he did not know what it was. He listed a number of problems he was experiencing, among them was his difficulty sleeping, and he stated that his wife thought perhaps he had sleep apnea. The same day, he met with Clifford and told her about the health problems he was experiencing including his lack of sleep. At an August 24, 1999 meeting with York and Clifford, Pouliot talked about his diabetes and the depression he was experiencing and may have said something about being tired a lot. From September 1, 1999 to October 1999, he could not sleep. He had a September 2, 1999 note from Dr. Karageorge written "To Whom It May Concern," but it did not mention his inability to sleep. Around September 27, 1999, Pouliot's wife noticed that among other symptoms, he could not sleep.

In determining whether an individual is "substantially limited" in a major life activity, three factors are considered: the "nature and severity of the impairment; . . . [t]he duration or expected duration of the impairment; and . . . [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *See* 29 C.F.R. § 1630.2(j)(2). In regard to duration, Pouliot claims that his impairment has substantially limited his ability to sleep for

---

534 U.S. 184, ——, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002)(applying the EEOC regulations, where the parties have accepted the regulations as reasonable, without determining reasonableness and the level of deference due).

**8.** Pouliot's second amended complaint alleges impact on the major life activities of eating,

thinking, concentrating, interacting with others, and sleeping. (Second Am. Compl. ¶ 102.) His memorandum however states that he is only claiming sleep as the major life activity substantially limited by his impairments. (Pl.'s Resp. Mot. Summ. J. (Docket No. 26) at 29.) Therefore, the only major life activity discussed here is "sleeping."

many years. However, the record indicates that his inability to sleep is episodic, occurring first in 1984, then in 1996, and again beginning in November of 1999. Such an "intermittent manifestation of a disease must be judged the same way as all other potential disabilities," in other words, it must have a substantial limitation on a major life activity. *See E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir.2001) ("To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds."). The record shows that he was affected with difficulty sleeping for some months in 1984, 1996, 1998, and 1999. However, only in regard to the 1996 occurrence does he provide details beyond the mere assertion that he suffered an inability to sleep (i.e. he could sleep for only four or five hours per night). Pouliot does not set forth facts in the record showing that during the other episodes of impairment he was substantially limited in his major life activity of sleeping. Furthermore, although his sleep may have been substantially impaired in 1996, this fact does not show he was substantially limited in his major life activity of sleeping at the time the alleged discriminatory conduct occurred in 1999. *See Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 497–98 (10th Cir.2000) (finding that although plaintiff showed she suffered insomnia for two years with only one to three hours of sleep per night, the fact that she was able to sleep by the time of her discharge precludes an inference that her ability to sleep was significantly restricted).

Moreover, the EEOC's regulations state that the individual's significant restriction must be "compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(2). As many individuals find it difficult to sleep, Pouliot must show

that his "lack of sleep was worse than the quality of sleep of the general population." *See Sara Lee Corp.*, 237 F.3d at 352 (citing *Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir.1999)); *Colwell v. Suffolk Co. Police Dept.*, 158 F.3d 635 (2nd Cir.1998)(stating that difficulty sleeping is extremely widespread, therefore a plaintiff must show his affliction is worse than that suffered by a large portion of the population). Thus, it is imperative that Pouliot do more than merely assert he had difficulty sleeping. *See Doyal*, 213 F.3d at 496 ("An inquiry into whether a plaintiff is substantially limited in a major life activity requires an individualized analysis because an impairment that is disabling for some may not be disabling for others. We therefore must consider the evidence [plaintiff] offered in an effort to demonstrate that she was significantly restricted in . . . sleeping . . . .").

In *Felix v. N.Y. City Transit Authority*, 154 F.Supp.2d 640 (D.N.Y.2001), a plaintiff with a sleep disturbance lasting eight months and with well-documented records showing that the plaintiff obtained one to four hours of sleep per night, was found to have a profound sleep disturbance that rises well above the sleeping difficulties experienced by the general population. Similarly, the court in *Knorr v. Pepsico Food Services, Inc.*, 1999 WL 200685 (D.N.Y.1999), found that the plaintiff set forth sufficient evidence establishing a substantial limitation on her ability to sleep where she showed that the average person gets five to eight hours of sleep per night and she only obtained one to one and a half hours per night. Here, Pouliot establishes that he suffered from an inability to sleep, but he does so only in general terms such as stating that he had sleep problems, was not getting any rest, felt fatigued, and thought he was suffering from sleep apnea. *Cf. Colwell*, 158 F.3d at 644 (stating that plaintiff's "descriptions of

his limitations are marked throughout by hedging and a studied vagueness, so that there is no support for the idea that his impairments would be significantly limiting to 'the average person in the general population' " and in regard to "sleeping," finding insufficient plaintiff's assertion that he had to take sleeping pills and usually had a tough night's sleep.) As Pouliot has neither described his inability to sleep beyond generalities nor compared his inability to sleep with that of the average population, he has not provided evidence to support a reasonable conclusion that he was significantly restricted in his ability to sleep.

Based on the foregoing analysis, Pouliot has not established that he had a "disability" as the term is defined by the ADA. Thus, he is not protected by the coverage of the ADA and his Count V failure to accommodate claim fails. Furthermore, as the analysis applied to the ADA applies to the Maine Human Right Act (MHRA), Pouliot's Count VII failure to accommodate claim under the MHRA also fails.[9] *See Bailey v. Georgia–Pacific Corp.,* 176 F.Supp.2d 3, 11 (D.Me.2001) (stating that the court "ordinarily does not distinguish between analysis under the ADA and the MHRA" and applying ADA conclusion to the MHRA claim without further analysis).

### C. Release of Confidential Information Claims

Counts IV and VI assert that the Town violated the ADA and the MHRA by releasing confidential medical information about Pouliot. As a preliminary matter, the MHRA requires that a plaintiff asserting a claim for violation of the release of confidential information be a "qualified individual" with a "disability" as defined by the ADA. *See* 5 M.R.S.A § 4572(2). Thus,

the finding above that Pouliot does not have a "disability" within the confines of the ADA definition precludes discussion of his Count VI MHRA claim. The ADA, however, does not require that an individual must have a "disability" in order to assert a claim for disclosure of confidential information. *See* 42 U.S.C. § 12112(d)(4) (using the term "employee" rather than qualified individual with a disability); *Pouliot,* 184 F.Supp.2d at 52 n. 5 (collecting cases).

The relevant ADA provision regarding confidential medical information, 42 U.S.C. § 12112(d), contains four subsections. The first subsection prohibits discrimination under § 12112(a) in regard to medical examinations and inquiries. 42 U.S.C. § 12112(d)(1). The second and third subsection pertain to "preemployment" examinations and inquiries and employment entrance examinations. *Id.* at (d)(2) & (d)(3). The present matter does not fall into these subsections. The fourth subsection, labeled "examination and inquiry" specifies prohibited and acceptable medical examinations and inquiries as follows:

(A) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to

**9.** As the MHRA claim for failure to accommodate fails, I need not address the statute of limitations issue regarding the MHRA claims. *See Pouliot v. Town of Fairfield,* 184 F.Supp.2d 38, 52–53 (D.Me.2002) (stating that only conduct that postdates August 31, 1999 can be asserted by Pouliot under the MHRA).

employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

42 U.S.C. § 12112(d)(4)(A) & (B).

Information regarding an employee's medical condition or history obtained under subsection (B) are subject to the requirements of § 12112(d)(3)(B) and (C), which in relevant part states "information obtained regarding the medical condition or history of the [employee] . . . is treated as a confidential medical record . . . and . . . [is] used only in accordance with this subchapter." *Id.* at § 12112(d)(3)(B) & (C).

■ The Town asserts that there was no "employee inquiry" pursuant to subsection (d)(4)(B) therefore there is no violation of § 12112(d). In response, Pouliot points to the Town Council executive session in which Clifford tells him to share with the Council what he had told her about his medical condition. Pouliot claims that a jury could reasonably conclude that this constitutes an "employee inquiry" as the Town was concerned about his functioning in his job. Further, he asserts that the First Circuit has never stated that there must be either a health program or an employee inquiry. On this latter point, Pouliot's action does not involve "preemployment" under (d)(2) or an "employment entrance examination" under (d)(3), thus his claim is subject to the language of § 12112(d)(4)(C). Subsection (C) clearly states that the requirements regarding confidential information apply to information obtained through an employer examination conducted as part of a health program or an "employer inquiry" regarding an employee's ability to perform job-related functions. *Id.* at § 12112(d)(4)(C). Thus, the fact that the First Circuit has not limited the application of subsection (C) to these two situations is of little consequence.

Contrary to Pouliot's assertion, there is no triable issue regarding whether an "employee inquiry" occurred. According to the undisputed record, after leaving a meeting in York's office on August 18, 1999, Pouliot returned to her office and informed her that he was experiencing various problems, including diabetes. (PRSMF ¶ 21; PRASMF ¶ 38; Pouliot Dep. at 77–78.) He explains:

> . . . I thought it was time for her to know that, you know, [I was] trying to put up the front that I was indestructible and I could belong to every committee and work day and night and not sleep, you know, [sic] had caused some of these problems and that there was something wrong with me. I knew it [sic], I did not know what it was. I later found out what it was but at that time I was guessing it was my diabetes . . . .

(PRSMF ¶ 211; Pouliot Dep. at 78.)

That same day, he met with Clifford and told her he had diabetes, stress, mood swings, and a lack of sleep. (PRASMF ¶ 39.) In his deposition, Pouliot indicates that he went to Clifford's home, not because he was asked to do so, but on his own. (Pouliot Dep. at 82.) On August 24, 1999, Pouliot attended a Special Council Meeting in order to explain problems including Pouliot's overage in the budget and his use of the Town's credit card. (DSMF ¶ 38; PRSMF ¶ 38.) Prior to the meeting that day, Pouliot met with both York and Clifford and talked with them about his diabetes and depression. (PRASMF ¶ 54.) At this time, Clifford stated that he needed to tell the public about his medical problems affecting his behavior or else the public would think he was a thief. (*Id.* ¶ 55.) He asked Clifford and York to keep his medical information confidential. (*Id.* ¶ 54.) At the Special Council Meeting held later that day, Pouliot read a statement explaining to the Town

and the public that he was taking full responsibility for the budget and its overdraft and attributing some of the problems and issues to his "underlying medical, health, and personal issues being currently addressed." (DSMF ¶ 42; Ex. 12 & 17.) Within the next few days, Clifford issued a press release that reported Pouliot's conduct was "an aberration resulting from a poorly-treated medical condition." (DSMF ¶ 50.) After this meeting, Clifford was quoted in a newspaper as stating that Pouliot's conduct was caused in part by a medical condition and complications with medications.

On September 1, 1999, the Council and Pouliot met in an executive session closed to the public. (DSMF ¶ 54.) During this meeting, Clifford asked Pouliot to share with the Council what he had told her about his medical condition. (*Id.*) Pouliot obliged and informed the Council that he suffered from diabetes and he mentioned depression. (*Id.* ¶ 56; PRSMF ¶ 56.) He then asked the Council to keep the information confidential. (PRASMF ¶ 52.) Bouchard was present at this meeting and later disclosed to the press that Pouliot had diabetes. (PRASMF ¶ 64; DSMF ¶ 201.) Two newspapers subsequently reported that Pouliot was being treated for diabetes. (PRSMF ¶ 201.)

As this chain of events indicates, Pouliot's medical information was not obtained as the result of an "employer inquiry." The Town did not make an inquiry on August 18, 1999, when Pouliot voluntarily told York and Clifford that he had diabetes. Albeit, about a week later Clifford asked Pouliot to share with the Council what he shared with her about his "medical condition," but this occurred after he had voluntarily disclosed his medical information to York and Clifford and he had made it public that he had a "medical condition." *Cf. Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir.2000) (holding that

§ 12112(d) does not protect the confidentiality of "voluntary disclosures initiated by the employee"); *Rohan v. Networks Presentation, LLC*, 175 F.Supp.2d 806, 814 n. 12 (D.Md.2001) (stating that "[c]ourts in several circuits have read 42 U.S.C. § 12112(d) as requiring confidentiality of employee medical information only when the employer obtains this information as a result of an employee health program or an inquiry" and citing cases). There is no evidence in the record that Clifford asked Pouliot for information beyond the information he disclosed to her earlier. *Cf. Lanxon v. Crete Carrier Corp.*, 2001 WL 1589627, *10 (D.Neb. Dec.13, 2001). As Pouliot has not established that there was an "employer inquiry" or a medical examination, he has not shown a violation of § 12112(d)(4)(C).

Even if there were an employee inquiry, the Town argues that Pouliot would not be able to maintain a breach of confidentiality claim because he cannot show an injury in fact specifically caused by the disclosure. According to the Town a technical violation of the statute is not sufficient. Although this issue has not been addressed by the First Circuit, the Third Circuit recently touched upon the question in *Tice v. Centre Area Transportation Authority*, 247 F.3d 506 (3rd Cir.2001), and concluded that summary judgment in favor of the employer is appropriate where the plaintiff has not been prejudiced by a violation of § 12112(d)(3)(B) & (d)(4)(C). *See Tice*, 247 F.3d at 519–520 (collecting cases and stating that the other courts of appeals that have addressed whether a plaintiff can pursue a claim for a violation of § 12112(d) without showing an "injury-in-fact" have concluded that a claim cannot stand where the plaintiff presents no injury). Pouliot has not established any injury and the record does not indicate that an injury has occurred.

Based on the foregoing analysis, Pouliot's Count IV and Count VI ADA and MHRA claims fail.

### D. Section 1983 Right of Privacy Claim

Count III alleges that the individual defendants disclosed confidential information in violation of Pouliot's right to privacy pursuant to § 1983. Pouliot's claim rests on Councilor Bouchard's statement to the press that Pouliot was being treated for diabetes, which was subsequently published by two papers.[10] Defendant claims that he is entitled to qualified immunity for the release of Pouliot's medical information.

■ In determining whether qualified immunity applies, three factors must be determined: (1) "whether the plaintiff's allegations, if true, establish a constitutional violation"; (2) "whether the right was clearly established at the time of the alleged violation"; and (3) "whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right." *Suboh v. District Attorney's Office of Suffolk Dist.,* 298 F.3d 81, 90 (1st Cir.2002).

The first prong requires a determination of whether this claim amounts to a constitutional violation. In general, there is a "right of privacy" under the Fourteenth Amendment's concept of personal liberty. This has been characterized as having two branches of interest, an interest in avoiding the disclosure of personal matters and an interest in independence in making certain kinds of important decisions. *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The former is often labeled as an interest in "confidentiality"

and the latter an interest in "autonomy." The present matter falls within the confidentiality branch. The dissemination of an individual's personal information implicates the right of privacy protecting confidential personal information.

Neither the First Circuit nor this Court has directly decided whether the first category, confidentiality, protects individuals against dissemination of their confidential medical information. *See Pouliot,* 184 F.Supp.2d at 50. Pouliot asserts that the First Circuit in *Vega–Rodriguez v. Puerto Rico Telephone Co.,* 110 F.3d 174 (1st Cir. 1997), held that the confidentiality branch can include protection from the disclosure of medical information. In *Vega–Rodriguez,* the Court stated:

> The autonomy branch of the Fourteenth Amendment right to privacy is limited to decisions arising in the personal sphere—matters relating to marriage, procreation, contraception, family relationships, child rearing, and the like. *See Paul [v. Davis],* 424 U.S. [693] at 713, 96 S.Ct. [1155] at 1166[, 47 L.Ed.2d 405]; *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965)....Even if the right of confidentiality has a range broader than that associated with the right to autonomy, *but cf. Borucki [v. Ryan],* 827 F.2d [836] at 841–42 [1st Cir.1987] (suggesting that the right of confidentiality protects only information relating to matters within the scope of the right to autonomy), that range has not extended beyond prohibiting profligate disclosure of medical, financial, and other inti-

---

**10.** Pouliot's claim also included an allegation that Clifford disclosed confidential information about his medical condition, however, the record shows that her disclosure amounted to a statement that Pouliot had a "medical condition" and was made after Pouliot made a public statement that his behavior was

linked to "underlying medical conditions" that were currently being addressed. As her statement did not go beyond the information Pouliot had already released to the public, she did not disclose confidential information. Thus, the only statement for discussion here is Bouchard's statement to the press.

mately personal data. *See id.* at 841 n. 8 & 842 (collecting cases).

*Vega–Rodriguez,* 110 F.3d at 183.

Thus, *Vega–Rodriguez* only goes as far as to say that the confidentiality branch does not go beyond the disclosure of medical information or intimately personal data; it does not establish the parameters of this right. In contrast to the First Circuit, both the Third Circuit and the Seventh Circuit have directly addressed the question and have found there is a right to privacy in one's medical information. *See Doe v. Delie,* 257 F.3d 309, 315 (3rd Cir.2001); *Denius v. Dunlap,* 209 F.3d 944, 956 (7th Cir.2000).

During the 1990's the circuit courts varied in determining the scope of the confidentiality branch of the right of privacy. For example, the Tenth Circuit held that the state's release of intimate and personal information contained in a diary violated the confidentiality branch because, although the information was not "extremely sensitive in nature" or embarrassing, it was personal and there was an expectation of privacy. *Sheets v. Salt Lake County,* 45 F.3d 1383, 1388 (10th Cir.1995); *See also Nilson v. Layton City,* 45 F.3d 369, 371–372 (10th Cir.1995) (stating that the test for determining whether information is of such a personal nature that it demands constitutional protection, involves consideration of whether there is a legitimate expectation of privacy, whether disclosure serves a compelling state interest, and whether disclosure can be made in the least intrusive manner and further stating that a plaintiff has a legitimate expectation

of privacy if the information is "highly personal or intimate."). The Eighth Circuit, having a requirement similar to the Tenth Circuit, states that the "protection against public dissemination of information is limited and extends only to highly personal matters representing the most intimate aspects of human affairs" but further states that the disclosure "must be either a shocking degradation or an egregious humiliation... or a flagrant breach of a pledge of confidentiality which was instrumental in obtaining the personal information." *Riley v. St. Louis County of Mo.,* 153 F.3d 627, 631 (8th Cir.1998) (citing *Eagle v. Morgan,* 88 F.3d 620, 625 (8th Cir.1996)). *See also Cooksey v. Boyer,* 289 F.3d 513 (8th Cir.2002) (holding that the mayor's disclosure that the police chief was undergoing psychological treatment for stress was not a constitutional violation of his right to privacy because it was not shockingly degrading, egregiously humiliating, nor was there any evidence that he was stigmatized by the disclosure). The court found that the police department's photographing of the plaintiff's deceased son, displaying the photo at a public assembly, and making slanderous comments regarding the deceased's alleged gang activities did not violate her in avoiding disclosure of personal matters. *Id.* at 631.

 In regard to cases involving the confidentiality branch, the constitutional right to non-disclosure appears to be limited to HIV, AIDS, mental health, matters of an embarrassing or humiliating nature, or matters in which the person had a legitimate expectation of confidentiality.[11]

---

11. As my prior discussion suggests, the circumstances surrounding Pouliot's disclosure does not suggest an expectation of confidentiality. Pouliot reports that prior to his disclosure, several members of the police department knew that he had diabetes because he had to eat candy bars at odd hours of the day when his blood sugar was getting low and because he had to watch his diet in an attempt to control his sugar level. (PRSMF ¶ 200; PRASMF ¶ 101.) Furthermore, prior to his disclosure at the September 1 executive session, Pouliot informed both Clifford and York that he had diabetes. (PRASMF ¶¶ 39, 54.) Before becoming a Council member, Bois served on various committees with Pouliot and during that time Pouliot told Bois that he had diabetes. (DSMF ¶ 59.)

Although the fact that Pouliot was being treated for diabetes is personal information, the disclosure of such information does not fall within this realm. Thus, I find that Defendant's 1999 disclosure to the media that Pouliot is being treated for diabetes is not a constitutional violation.

 The second prong need not be addressed, but assuming arguendo that Defendant's statement amounted to a constitutional violation, I will address Defendant's assertion that he is entitled to qualified immunity. This prong requires determining whether the right asserted was "clearly established" at the time of the alleged violation. The Supreme Court has recently stated:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope v. Pelzer*, —— U.S. ——, ——, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666, —— (2002) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Not all governmental disclosures of personal confidential information implicate the right of privacy. As of 1992, there was not a clearly established constitutional right to privacy in the non-disclosure of confidential information. *See Hansen v. Lamontagne*, 808 F.Supp. 89, 94 (D.N.H.1992).

Some courts found that the constitutional right to privacy encompasses nondisclosure of HIV status, information related to AIDS, and mental health information. *See Doe v. Town of Plymouth*, 825 F.Supp. 1102, 1107 (D.Mass.1993) (collecting cases). One of our sister courts found that the disclosure of plaintiff's HIV status was a protected privacy interest in *Doe v. Town of Plymouth*, 825 F.Supp. 1102 (D.Mass. 1993). Although there are no First Circuit cases squarely on point, the Court has held that as of 1983, the state's dissemination of a plaintiff's personal psychiatric information was not clearly established as protected by the confidentiality branch of the right of privacy.[12] *See Borucki*, 827 F.2d at 845.

The discussion above of the pre-existing law clearly shows that the contours of the confidentiality branch were not sufficiently established in 1999 to find that a reasonable officer would have understood that stating Pouliot was being treated for diabetes was a constitutional violation of the right to privacy.

The third inquiry is whether, based on the facts, a reasonable actor in Bouchard's situation could have concluded that informing the press that Pouliot has diabetes was a violation of Pouliot's right to privacy. Bouchard first learned that Pouliot had diabetes at the September 1, 1999 executive session when Pouliot informed the entire Council. However, the disclosure occurred when Clifford asked him to share with the Council what he had previously told her about his medical condition. During the disclosure, Pouliot also stated that his medical problems were one of the reasons for his budgeting and spending prob-

---

12. Further, the First Court has held that surveillance at the workplace does not violate the confidentiality branch. *See Vega–Rodriguez*, 110 F.3d at 183. This Court has also determined that a plaintiff has no constitutional privacy interest in his identity, his address, and his arrest or conviction record. *See Corbin v. Chitwood*, 145 F.Supp.2d 92 (D.Me. 2001).

lems and that he had low self-esteem which is why he went on spending sprees. After his disclosure, Pouliot asked the Council members to keep the information confidential. Pouliot had previously disclosed publicly that he had an "underlying medical condition" that attributed to his behavior. During Bouchard's statement to the press, he stated that Pouliot was being treated for diabetes. In Bouchard's mind, diabetes was easily controlled with medication or diet. Although Bouchard's motive has no constitutional significance, he reports that he did not mean any animosity toward Pouliot when he made the statement; he was actually trying to defend Pouliot.

According to the facts Bouchard had when he made the statement to the press, it was public information that Pouliot had some form of a medical condition and it was clear that Pouliot had previously disclosed at least to Clifford that he had diabetes. Although Pouliot asked for the information he revealed during that session to be confidential, there were many personal things Pouliot revealed aside from his having diabetes including his stress related problems and depression. As this is not a case involving the disclosure of a person's HIV status, mental illness, or embarrassing or humiliating personal information, it does not seem likely that an officer would immediately realize that specifically using the word "diabetes" to the press in these circumstances would constitute a constitutional violation of the right of privacy. *See Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If the officer's mistake as to what the law requires is reasonable... the officer is entitled to the immunity defense."). Under these facts, I find that a reasonable official in Bouchard's situation would not have concluded that he was violating Pouliot's constitutional rights in specifically disclosing that Pouliot has diabetes. Based on the foregoing, Defendant is

therefore protected from liability by qualified immunity, even if I am incorrect in my analysis that no constitutional violation occurred.

### Conclusion

I now **GRANT** summary judgment in favor of the Defendants on Counts II, III, IV, V, VI, and VII.

*So Ordered.*